*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
March 31, 2022

v

No. 352274
Ottawa Circuit Court
LC No. 19-043164-FC

SCOTT ALLEN DEBRUYN,

        Defendant-Appellant.

Before: K. F. KELLY, P.J., and SAWYER and GADOLA, JJ.

PER CURIAM.

Defendant was convicted after a jury trial of delivering a controlled substance causing death, MCL 750.317a. The trial court sentenced defendant to 198 to 360 months' imprisonment. Defendant appealed as of right and moved for remand to the trial court for an evidentiary hearing to determine whether he was entitled to a new trial on the basis that he was denied the effective assistance of counsel. This Court granted the motion[1] and remanded the matter to the trial court for a *Ginther*[2] hearing. At the conclusion of the evidentiary hearing on remand, the trial court denied defendant's motion for a new trial, finding that defendant was not denied the effective assistance of counsel at trial. Returning to this Court after remand, defendant challenges the trial court's order denying his motion for a new trial. We affirm.

## I. FACTS

Defendant's conviction relates to the death of Camille Gesiakowski, who was found dead in defendant's motel room on the morning of April 12, 2017. At the time of her death,

---

[1] *People v DeBruyn*, unpublished order of the Court of Appeals, entered December 17, 2020 (Docket No. 352274).

[2] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973) ("A defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts . . .").

Gesiakowski was 23 years old and defendant was 53 years old. The two had known each other since Gesiakowski dated defendant's son while a teenager. Sometime after that relationship ended, Gesiakowski and defendant began a relationship and lived together for a time. At some point, Gesiakowski began abusing opioids and other substances.

On April 7, 2017, less than one week before her death, Gesiakowski was released from jail where she had served approximately 8 ½ months after violating probation for charges related to drug use. Communications between Gesiakowski and defendant while she was in jail demonstrated that the couple intended to meet upon her release from jail to use "oxy," apparently referring to the opioid oxycodone, and other drugs. In these communications, they repeatedly discussed defendant's efforts to obtain "oxy" for Gesiakowski; in one exchange Gesiakowski stated that "I can't wait to take some oxys," and defendant replied that he had "some" and that he had "good stuff." In another exchange, when Gesiakowski stated that she wanted oxy, defendant replied that he had "some of them" and that he could "get some oxys from Lona between now and then." Defendant also stated that they could "pick up a can or two later on," apparently referring to cans of compressed air, commonly known as air duster, manufactured for use in cleaning, but sometimes misused for inhaling or "huffing" to produce a disorienting or euphoric effect.

When Gesiakowski was released from jail on April 7, 2017, defendant picked her up and the two went to a Walmart store where defendant purchased two cans of air duster and two bottles of wine. Upon learning that Gesiakowski had been released earlier than expected, Gesiakowski's sister, Celia, went to defendant's house and discovered that Gesiakowski was unresponsive, lying on a bed surrounded by pill bottles and a can of air duster. Celia also saw open alcohol bottles in the house and guns standing against the wall. Celia was able to revive Gesiakowski, whom Celia described as delirious, and transport her to their parents' home.

Thereafter, Gesiakowski and defendant exchanged numerous messages in which they discussed meeting to use drugs and defendant's efforts to obtain "pills" and "duster." Throughout the extensive message exchange, defendant was insistent that the couple meet to spend time together, while Gesiakowski was insistent that defendant obtain oxycodone as a condition of them meeting. During the message exchange, defendant assured Gesiakowski that he had "another can and stuff," and that he was buying pills. Gesiakowski asked whether the pills were "oxys," to which defendant responded, "Yeah. I got more coming. Good." Gesiakowski asked defendant to drop some off to her, and repeatedly told defendant that she had a headache and that she needed the pills. Defendant agreed to drop off a can of air duster and some wine. Later in the exchange, Gesiakowski emphasized that she had a migraine and needed "pain pills." Defendant responded that he had "hooked up with Mike's stuff," and that he had gotten "a hold of Lona."

Gesiakowski left her parents' house on the evening of April 9, 2017, and joined defendant at his house after defendant purchased two cans of air duster. On April 10, 2017, defendant purchased another four cans of air duster at Walmart. That same day, defendant purchased 40 Percocet pills, a medication containing oxycodone and acetaminophen, from Lona Daniels and her boyfriend, Michael Montgomery; each pill contained 10 milligrams of oxycodone and 325 milligrams of acetaminophen. According to Daniels, defendant paid her $400 for the 40 pills. Montgomery testified similarly that on April 9, 2017, defendant texted Daniels looking for pills, and Montgomery told Daniels that he would sell defendant 40 pills for $400. Montgomery traveled with Daniels to Grand Haven to sell defendant the pills, and waited in the car while Daniels

completed the transaction. He further testified that he had sold pills to defendant 20 or 30 times in the past.

On April 11, 2017, Gesiakowski's father, Blake, called the police and asked them to check on the welfare of Gesiakowski at defendant's house. The police went to the house, but did not retrieve Gesiakowski. Blake then went to defendant's house, but was unable to convince Gesiakowski to come outside. Blake later returned to defendant's house, but discovered that defendant and Gesiakowski had left.

After leaving the house on April 11, 2017, defendant and Gesiakowski took a taxi to a Walmart store, where defendant purchased additional cans of air duster. Defendant and Gesiakowski then traveled to the Baymont Inn in Grand Haven, where defendant rented a room. After learning where the couple had gone, Blake went to the Baymont Inn. Blake told the desk clerk that Gesiakowski might be in danger, but the clerk said that there was nothing he could do. Blake banged on the door of the motel room where the couple was staying until police arrived and advised Blake that he would be arrested if he did not leave.

The next morning, on April 12, 2017, at approximately 6:00 a.m., defendant went to the front desk of the Baymont Inn and told the desk clerk to call 911 because Gesiakowski was not breathing. Although defendant had a cell phone in his possession, he did not call 911. While the desk clerk called 911, defendant returned to his room. When police arrived, they saw defendant in the parking lot, smoking a cigarette. Police found Gesiakowski dead in defendant's room. The room was extremely cold, and Gesiakowski's body was cold to the touch. In the room, police found four empty cans of air duster, but did not find any pills or empty pill bottles.

Defendant told police that he and Gesiakowski arrived at the motel the day before at 4:30 p.m. and that they "were just hanging out." He told police that they went to bed at approximately seven or eight p.m., but that Gesiakowski said that she did not feel well and repeatedly went to the bathroom to vomit. At approximately 3:00 a.m., Gesiakowski again vomited in the bathroom and again said that she did not feel well. When defendant awoke at approximately 6:00 a.m., he found Gesiakowski was dead. Gesiakowski was found unclothed from the waist up; defendant reported that she was wearing clothes earlier, but she had complained that she was very hot and had turned the air conditioning to a very cold setting.

Prosecutors charged defendant with delivering a controlled substance causing death, MCL 750.317a, alleging that defendant delivered oxycodone, a Schedule 2 controlled substance, to Gesiakowski, who then died after consuming it. At trial, the prosecution introduced evidence that Gesiakowski died of mixed-drug toxicity, caused by a combination of four of the substances found in her system: oxycodone[3] (a semisynthetic opioid pain reliever), tramadol (a synthetic opioid pain reliever), fluoxetine (an antidepressant branded as Prozac), and difluoroethane (a halogenated hydrocarbon used as an aerosol propellant in compressed air dusters). Regarding the cause of death, the prosecution called as witnesses toxicologist Dr. Benedict Kuslikis, toxicologist

---

[3] A conviction under MCL 750.317a requires delivery of a Schedule 1 or 2 controlled substance. Among the toxins found to have contributed to Gesiakowski's death from mixed-drug toxicity, only oxycodone qualifies as a Schedule 1 or 2 controlled substance.

Dr. Matthew McMullin, pathologist Dr. Matthew Carr, and forensic pathologist and chief medical examiner Dr. David Start. The consensus of the prosecution's experts was that all four substances played a role in Gesiakowski's death and that oxycodone, a Schedule 2 controlled substance, was a substantial factor in Gesiakowski's death. Dr. Start testified that oxycodone was the most significant factor in her death, while Dr. Carr testified that, assuming Gesiakowski had not been using oxycodone while in jail, the amount of oxycodone she consumed on April 11, 2017, was alone enough to have caused her death.

The defense contended that the prosecution failed to demonstrate that defendant delivered oxycodone to Gesiakowski and also failed to prove that oxycodone was a substantial cause of Gesiakowski's death. The defense further contended that serotonin syndrome, caused by the interaction of tramadol and fluoxetine, or the effect of difluoroethane alone, had not been excluded as causes of Gesiakowski's death. The defense did not present an expert witness to support its causation theories, but cross-examined the prosecution's experts on the theories that serotonin syndrome or difluoroethane caused Gesiakowski's death.

At the conclusion of trial, the jury convicted defendant. Thereafter, defendant appealed to this Court and moved for remand to the trial court for determination whether he was entitled to a new trial on the basis that defense counsel provided ineffective assistance. Defendant contended that counsel had been ineffective by failing to properly investigate the cause of Gesiakowski's death, and also failing to call an expert in toxicology and/or pathology to refute the opinions of the prosecution's experts and to support the defense theories of the cause of death.

This Court remanded to the trial court for an evidentiary hearing. During the hearing, the trial court heard testimony from defendant's trial attorneys, as well as defense experts Dr. Gerald Shiener, a psychiatrist, and Dr. Randall Commissaris, Ph.D., qualified by the trial court as an expert in the areas of pharmacology and toxicology, regarding the cause of Gesiakowski's death. The prosecution again called Dr. Kuslikis, Dr. Start, and Dr. Carr, who reiterated their opinions offered at trial and responded to new matters raised by defendant's experts. Following the hearing, the trial court denied defendant's motion for a new trial, finding that (1) defense counsel's performance did not fall below an objective standard of reasonableness, and that (2) presentation of expert testimony, such as that presented by the defense at the *Ginther* hearing, would not have affected the outcome of the proceedings. This matter now returns to this Court after remand.

## II. DISCUSSION

Defendant contends that the trial court erred by finding that his trial counsel was not ineffective and consequently denying his motion for a new trial. Defendant argues that, contrary to the trial court's findings, his trial attorneys performed below an objective standard of reasonableness by failing to investigate and to obtain an expert in toxicology to refute the evidence introduced by the prosecution regarding the cause of Gesiakowski's death, and that this failure resulted in prejudice to defendant. Defendant further argues that the trial court demonstrated a misunderstanding of its role and the purpose of the *Ginther* hearing when it engaged in impermissible fact-finding and allowed the prosecution to call expert witnesses at the hearing on remand.

-4-

## A. STANDARD OF REVIEW

A claim of ineffective assistance of counsel is a mixed question of fact and law. *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015). We review the trial court's findings of fact for clear error and review de novo the ultimate constitutional question arising from a claim of ineffective assistance. *Id*. When reviewing an ineffective assistance claim, this Court will not substitute its judgment for counsel's on matters of trial strategy, *People v Unger*, 278 Mich App 210, 243; 749 NW2d 272 (2008), nor will we use the benefit of hindsight to assess counsel's competence. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004). However, counsel's performance is not insulated from review simply by calling it "trial strategy," and we must consider whether strategic choices were made without an adequate investigation. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

## B. MCL 750.317A

Defendant was convicted of delivering a controlled substance causing death, prohibited by MCL 750.317a, which provides:

> A person who delivers a schedule 1 or 2 controlled substance, other than marihuana, to another person in violation of section 7401 of the public health code, 1978 PA 368, MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years.

The elements of delivering a controlled substance causing death under MCL 750.317a are (1) delivery to a person, (2) of a schedule 1 or 2 controlled substance other than marijuana, (3) with intent to deliver a controlled substance as proscribed by MCL 333.7401, (4) consumption of the controlled substance by a person, (5) resulting in the death of that person from the consumption of the controlled substance. *People v McBurrows*, 504 Mich 308, 319; 934 NW2d 748 (2019). MCL 750.317a is a general intent crime that does not require that the defendant intend that death occur from the delivery of the controlled substance, but only that the defendant intend to deliver a schedule 1 or 2 controlled substance. *People v Plunkett*, 485 Mich 50, 60; 780 NW2d 280 (2010). The statute punishes "an individual's role in placing the controlled substance in the stream of commerce, even when that individual is not directly linked to the resultant death." *McBurrows*, 504 Mich at 317, quoting *Plunkett*, 485 Mich at 60.

To hold a defendant criminally responsible, the trier of fact must find beyond a reasonable doubt that the defendant's conduct was a proximate cause of the harm to the victim. See *People v Feezel*, 486 Mich 184, 201; 783 NW2d 67 (2010). The harm suffered by the victim may have more than one cause, however. In *People v Bailey*, 451 Mich 657, 676; 549 NW2d 325 (1996), amended 453 Mich 1204 (1996), our Supreme Court explained:

> In assessing criminal liability for some harm, it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm. The criminal law does not require that there be but one proximate cause of harm found. Quite the contrary, all acts that proximately cause the harm are recognized by the law.

> If a certain act was a substantial factor in bringing about the loss of human life, it is not prevented from being a proximate cause of this result by proof of the fact that it alone would not have resulted in death, nor by proof that another contributory cause would have been fatal even without the aid of this act. [*Id*., quoting Perkins & Boyce, Criminal Law (3d ed), p 783.]

Consistent with *Bailey*, the standard jury instruction related to delivery of a controlled substance causing death states, in relevant part, that the prosecution is required to prove that consuming the controlled substance caused the victim's death, but that:

> There may be more than one cause of death. The controlled substance delivered by the defendant does not need to be the sole cause of [victim's name]'s death. The prosecutor is only required to prove that the controlled substance was a contributing cause that was a substantial factor in the death of [victim's name]. It does not matter if there was another contributing cause to the death. [M Crim JI 12.2a(6).]

Thus, in this case, the prosecution was required to demonstrate that defendant delivered the oxycodone to Gesiakowski, that he intended to deliver it, that she consumed it, and that her death resulted from her consumption of the oxycodone, which is demonstrated if the evidence shows that the oxycodone was a contributory cause that was a substantial factor in her death, regardless of whether there were other contributory causes. See *Bailey*, 451 Mich at 677 (An intervening act that causes harm to the victim will "only serve to cut off the defendant's criminal liability when the intervening act is the sole cause of harm.").

## C. INEFFECTIVE ASSISTANCE

Defendant contends that his trial attorneys performed below an objective standard of reasonableness because they failed to investigate and to present an expert witness to refute the evidence presented by the prosecution regarding the cause of Gesiakowski's death, and that this failure resulted in prejudice to defendant. We disagree.

A defendant's right to counsel is guaranteed by the United States and the Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20. The right to counsel includes the right to effective assistance of counsel. *People v Smith*, 336 Mich App 79, ___; 969 NW2d 548, 562 (2021). A defendant is entitled to have his counsel prepare, investigate, and present all substantial defenses, which are defenses that might make a difference in the outcome of the trial, *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009), but decisions about which defenses and arguments to present are matters of trial strategy regarding which defense counsel must be afforded broad discretion. *People v Pickens*, 446 Mich 298, 324-325; 521 NW2d 797 (1994). Specifically, the decision whether to call witnesses is a matter of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). There is a strong presumption that trial counsel's decision-making is the result of sound trial strategy, *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020), and the defendant must overcome that strong presumption to demonstrate that counsel was ineffective. See *Trakhtenberg*, 493 Mich at 52. "If counsel's strategy is reasonable, then his or her performance is not deficient." *People v Randolph*, 502 Mich 1, 12; 917 NW2d 249 (2018).

To establish ineffective assistance of counsel premised on the failure to call witnesses, a defendant is required to demonstrate, as with any other claim of ineffective assistance of counsel, that (1) defense counsel's performance fell below an objective standard of reasonableness, and that (2) there is a reasonable probability that, but for counsel's deficient performance, there would have been a different outcome. *People v Jurewicz*, 506 Mich 914 (2020), citing *Trakhtenberg*, 493 Mich at 51. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *People v Zitka*, 335 Mich App 324, 341; 966 NW2d 786 (2020), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

To overcome the presumption that counsel's decision not to call an expert witness was a legitimate trial strategy, the defendant must meet a heavy burden by establishing a record that " 'excludes hypotheses consistent with the view that his trial court lawyer represented him adequately.' " *People v Mitchell*, 454 Mich 145, 163; 560 NW2d 600 (1997), quoting *Ginther*, 390 Mich at 442-443. Counsel may decide not to call an expert for strategic reasons, such as when cross-examination is determined to provide a sufficient means to expose defects in the opinions of the prosecution's experts. *Harrington v Richter*, 562 US 86, 111; 131 S Ct 770; 178 L Ed 2d 624 (2011). Although decisions regarding experts must be based on sufficient information and constitute a matter of trial strategy only when they are made after thorough investigation, *Ackley*, 497 Mich at 390, a failed strategy does not equate to a deficient performance. *White*, 331 Mich App at 149.

In this case, the prosecution introduced evidence at trial that defendant delivered oxycodone to Gesiakowski in the form of Percocet, a prescription drug containing oxycodone and acetaminophen, and that thereafter Gesiakowski died of mixed-drug toxicity caused by a combination of four substances: oxycodone, tramadol, fluoxetine, and difluoroethane. Of these four substances, only oxycodone is a schedule 2 drug, MCL 333.7214(a)(*i*), and thus only if that drug was a contributory cause that was a substantial factor in Gesiakowski's death was MCL 750.317a violated. At trial, the prosecution's expert witnesses concurred that the combination of all four substances caused Gesiakowski's death, and that the oxycodone was a substantial factor in causing her death.

Defendant contends that effective assistance required defense counsel to investigate whether the oxycodone caused Gesiakowski's death and to call a toxicologist and/or pathologist at trial as an expert witness to refute the testimony of the prosecution's witnesses. Contrary to defendant's argument, however, defense counsel did not fail to investigate the cause of Gesiakowski's death. Before trial, defense counsel consulted with Dr. Daniel Spitz, identified as a forensic pathologist[4] by the State Appellate Defender's Office, regarding the role of oxycodone

---

[4] Dr. Spitz also was identified as a toxicologist, but defense counsel thereafter learned that Dr. Spitz was not a toxicologist. Toxicology is defined by the Society of Toxicology as "the study of the adverse effects of chemical, physical, or biological agents on people, animals, and the environment." Toxicology Education Foundation, <http://www.toxedfoundation.org> (accessed February 25, 2022). Toxicology evidence is used in homicide investigations to determine if the victim consumed drugs and whether a drug or combination of drugs was fatal. 40 AmJur Trials 501, Forensic Pathology in Homicide Cases, Toxicological Evidence, § 34. A forensic pathologist

in Gesiakowski's death. Dr. Spitz offered an opinion unfavorable to the defense to the effect that the amount of oxycodone Gesiakowski consumed, even without the other substances, would have caused her death. Thereafter, defense counsel interviewed Dr. Kuslikis,[5] a toxicologist identified as a prosecution witness, whose opinion supported the prosecution's theory that the cause of death was mixed-drug toxicity including oxycodone, which was a substantial factor in Gesiakowski's death.

After investigating the role of oxycodone in Gesiakowski's death, defense counsel determined to cast doubt upon the prosecution's theory that oxycodone was a substantial factor in Gesiakowski's death by cross-examination of the prosecution's witnesses rather than calling a defense expert on causation.[6] At the *Ginther* hearing, defense counsel explained that through cross-examination, they were able to use the prosecution's toxicologist and medical examiner to present defendant's theories that the level of oxycodone in Gesiakowski's blood was not extremely high, and that more significant factors in her death were the likelihood of serotonin syndrome, caused by the combination of tramadol and fluoxetine, and also difluoroethane from huffing air duster. The record supports that defense counsel at trial were able to present these theories through a thorough and knowledgeable cross-examination of the prosecution's experts.

The record thus demonstrates that defense counsel investigated the cause of death by consulting a forensic pathologist and interviewing a toxicologist testifying for the prosecution, both of whom opined that oxycodone was a contributory cause that was a substantial factor in Gesiakowski's death, and defense counsel demonstrated command of the topic while cross-examining the prosecution's expert witnesses at trial; we therefore cannot conclude that defense counsel failed to investigate causation. Similarly, we cannot conclude that defense counsel's strategy to present the defense theories through cross-examination of the prosecution's experts was objectively unreasonable. Counsel was not required to "shop around" until they found an expert willing to offer them a favorable opinion. See *Ackley*, 497 Mich at 392. We conclude that the trial court did not clearly err by determining that defense counsel's performance did not fall below an objective standard of reasonableness in their investigation of causation and determination of trial strategy.

Defendant also argues that defense counsel was ineffective by failing to introduce expert testimony that Gesiakowski could not have consumed the Percocet defendant allegedly provided

---

is a subspecialist in pathology whose area of special competence is the examination of deceased persons to determine the cause and manner of death. See 40 AmJur Trials 501, Forensic Pathology in Homicide Cases, Nature of Forensic Pathology, § 6. Forensic pathologists are qualified to opine at trial regarding the cause and manner of a decedent's death. *Unger*, 278 Mich App at 251-252.

[5] 40 AmJur Trials 501, Forensic Pathology in Homicide Cases, Forensic Pathology, § 4, suggests that interviewing the prosecution's expert witness before trial is an effective strategy for defense counsel to gain understanding of the scientific intricacies of the case.

[6] 40 AmJur Trials 501, Forensic Pathology in Homicide Cases, Forensic Pathology, § 4, also suggests that an effective cross-examination by defense counsel of the forensic pathologist who performed the autopsy, ordinarily called as a prosecution witness, is a valid strategy that "can often win the case for the defense."

because Gesiakowski's blood tests did not indicate the presence of acetaminophen. At the *Ginther* hearing, appellate defense counsel presented as an expert witness Dr. Randall Commissaris, Ph.D., whom the trial court qualified as an expert in both pharmacology and toxicology. Dr. Commissaris opined that although the lab report indicates that Gesiakowski consumed oxycodone in the hours before her death, she did not consume it in the form of Percocet because the toxicology screen did not indicate the presence of acetaminophen in her blood.

In response, the prosecution recalled Dr. Kuslikis who testified that although the lab report did not indicate the presence of acetaminophen in Gesiakowski's blood, the report indicated that acetaminophen was present in her urine. He explained that acetaminophen metabolizes up to twice as fast as oxycodone and has a shorter "half-life," and thus it was not unusual that the lab report did not indicate acetaminophen in the blood, which is often present in a level too low to be indicated in a lab report. He further explained that drugs in the blood are excreted by the kidneys into the urine, and that the blood and urine levels of acetaminophen indicated in the lab report were "absolutely" consistent with a person having consumed Percocet. Dr. Start, the chief medical examiner, similarly testified that the lab report was not inconsistent with Gesiakowski having consumed Percocet. Because a review of the record demonstrates that acetaminophen not being indicated as present in the blood in the lab report did not establish that Gesiakowski did not consume Percocet, it was not a theory that could have defeated the prosecution's proof that Gesiakowski consumed Percocet provided by defendant. Defense counsel therefore was not ineffective for failing to present an expert witness to advance this theory.

Defendant further argues that defense counsel at trial was ineffective for failing to call an expert witness to testify that Gesiakowski's consumption of oxycodone was not a substantial factor in her death because (1) she was opioid tolerant from frequent opioid use, (2) the elevated level of fluoxetine and tramadol combined to cause serotonin syndrome and a fatal seizure, (3) huffing difluoroethane caused a seizure or cardiac arrest resulting in death, (4) the absence of Gesiakowski's prescribed anti-seizure medication in the lab report indicates that she had failed to take the medication and therefore was susceptible to seizure, and (5) post-mortem redistribution may have occurred, which may cause more oxycodone to be observed in the blood after death than was present in the blood at the time of death. We disagree that the record supports the viability of these theories.

With regard to opioid tolerance, Dr. Commissaris testified that Gesiakowski was unlikely to have died from consuming oxycodone because it was likely that she was opioid tolerant from previous opioid use. He testified that oxycodone will have less effect on someone with tolerance to the drug, that tolerance can arise relatively quickly, and that opioid tolerance will quickly reemerge in a former opioid user when he or she resumes use of the drug. Dr. Commissaris conceded, however, that he had no personal knowledge of Gesiakowski's history of drug use, such as her use of drugs while in jail or following her release. Because Dr. Commissaris' speculation regarding Gesiakowski's potential for opioid tolerance was not supported by the facts of this case, it is unpersuasive, and defendant was not prejudiced by counsel's failure to present a defense expert in toxicology to advance this theory.

With regard to the possibility of a fatal seizure, Dr. Commissaris opined that a seizure appeared probable and could have been caused by (1) serotonin syndrome, resulting from the interaction of fluoxetine and tramadol, (2) huffing difluoroethane, (3) the cessation of Keppra

(antiseizure medication prescribed for Gesiakowski while in jail), or (4) some combination of these factors. Dr. Commissaris noted that there was evidence that Gesiakowski felt hot on the night of her death, which is a symptom of serotonin syndrome. Defendant argues that individually or collectively this evidence demonstrates a reasonable probability of a different outcome had defense counsel called an expert witness to advance the theory that Gesiakowski died of a seizure caused by factors other than oxycodone. When questioned about mixed-drug toxicity, Dr. Commissaris agreed that "mixed drug intoxication" was "very likely" the cause of death, but opined that only tramadol, fluoxetine, and difluoroethane were related to seizures, and that oxycodone was the "least likely contributor" to Gesiakowski's death.

Dr. Commissaris' testimony that Gesiakowski suffered a seizure is purely speculative, however. Dr. Commissaris testified that Gesiakowski was at risk for a seizure, but there is no evidence that she, in fact, suffered a seizure; Dr. Kuslikis explained that seizures rarely leave evidence and that there was no evidence in this case that Gesiakowski suffered a seizure. Moreover, Dr. Commissaris' testimony does not demonstrate that oxycodone was not a contributory cause that was a substantial factor in Gesiakowski's death. See *Ackley*, 497 Mich at 394. Dr. Commissaris suggested that the other substances combined to cause Gesiakowski to have a seizure causing death; however, the evidence would need to demonstrate that the seizure was the sole cause of harm to adequately contradict the prosecutor's assertion that oxycodone was a contributing cause that was a substantial factor in Gesiakowski's death. See *Bailey*, 451 Mich at 677 (An intervening act that causes harm to the victim will "only serve to cut off the defendant's criminal liability when the intervening act is the sole cause of harm."). Dr. Carr testified that even if Gesiakowski suffered a seizure, mixed-drug toxicity caused her death and oxycodone was a substantial factor in her death. Defense counsel therefore was not ineffective for failing to call an expert witness to advance the theory that Gesiakowski suffered a seizure.

Dr. Commissaris also testified that post-mortem redistribution may have occurred and as a result the level of oxycodone in Gesiakowski's blood may have tested at a higher level after death than the level that actually was in her blood at the time of death. However, Dr. Carr testified that post-mortem redistribution was unlikely in this case because the autopsy was performed very quickly after the victim's death and that certain blood samples were taken from the victim's vitreous humor (eye), which is not susceptible to post-mortem redistribution. Further, Dr. Commissaris' testimony did not establish that if post-mortem redistribution had occurred it would have affected the level of oxycodone in the blood to the extent that it was no longer considered a substantial factor in Gesiakowski's death. Again, defense counsel was not ineffective for failing to call an expert witness to advance a theory that would not have negated the prosecution's proofs.

Because we conclude that counsel's performance did not fall below an objective standard of reasonableness, we need not reach the question whether counsel's decision not to call an expert in toxicology to advance the suggested theories resulted in prejudice. We conclude, however, that no such prejudice occurred. To establish prejudice, the defendant must demonstrate that, but for counsel's deficient performance, it is reasonably probable that a different result would have been reached. *Jurewicz*, 506 Mich 914 (2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Zitka*, 335 Mich App at 341, quoting *Strickland*, 466 US at 688. Here, defendant has advanced no theory that would have defeated the prosecution's case if advanced by an expert witness at trial.

-10-

We know certain things from the trial court record in this case. We know that the 23-year-old victim repeatedly implored defendant to obtain oxycodone for her use. We know that defendant obtained oxycodone in the form of 40 Percocet pills and that the next day defendant and Gesiakowski retreated to the motel room where she was found dead the following morning. We know that oxycodone was found in Gesiakowski's blood post-mortem. We know that all of the prosecution's experts testified that the level of oxycodone in Gesiakowski's blood stream, either alone or in combination with other drugs, was sufficient to cause her death. And we know that both of the experts defense counsel consulted before trial opined that the level of oxycodone in Gesiakowski's blood stream was sufficient to cause her death either alone or in combination with the other drugs in her system. We are unable to conclude that had defendant presented largely speculative alternate theories of the cause of Gesiakowski's death, there would have been a reasonable probability of a different outcome at trial.

Defendant also contends that the trial court misunderstood its role at the *Ginther* hearing and erred by allowing the prosecution to call witnesses and by evaluating the credibility of witnesses. In support of this argument, defendant cites *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998), for the proposition that a "trial judge does not sit as the thirteenth juror in ruling on motions for a new trial." Defendant's reliance on *Lemmon* is misplaced. *Lemmon* considered the trial court's role when ruling on a motion for a new trial premised on the contention that the verdict was against the great weight of the evidence. *Id.* By contrast, a *Ginther* hearing is an evidentiary hearing at which the trial court serves as fact-finder. See *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002) ("A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel.") Defendant also identifies no authority for the proposition that a prosecutor may not call witnesses at a *Ginther* hearing. The purpose of a *Ginther* hearing is to determine whether defendant was deprived of the effective assistance of counsel, and this generally includes receiving testimony from witnesses relevant to that determination. See *People v Morgan*, 456 Mich 946 (remanding for a *Ginther* hearing with instructions to allow testimony from several specified witnesses as well as "any other witness whose knowledge and credibility could have a determinative effect" in deciding the defendant's ineffective assistance claims). In presiding over a *Ginther* hearing, the trial court's role was precisely to find the facts and then decide whether those facts constituted a violation of defendant's right to the effective assistance of counsel. See *LeBlanc*, 465 Mich at 579.

Affirmed.


/s/ Kirsten Frank Kelly
/s/ David H. Sawyer
/s/ Michael F. Gadola

-11-